UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON
No. 5:17-CV-_____

_____

| | |
|---|---|
| SUE SMITH, )  | |
| ) | |
| Plaintiff ) | **COMPLAINT** |
| ) | **JURY TRIAL DEMANDED** |
| vs. ) | |
| ) | |
| LHC GROUP, INC., a Delaware ) | |
| Corporation, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| KENTUCKY LV, LLC, d/b/a, ) | |
| DEACONESS – LIFELINE HOME ) | |
| HEALTH, a Kentucky limited ) | |
| Liability company, ) | |
| ) | |
| Defendant ) | |

_____)

Plaintiff Sue Smith for her complaint against defendants LHC Group, Inc. and Kentucky LV, LLC, d/b/a Deaconess – Lifeline Home Health states as follows:

**I**

**Nature of the Case**

1.  This case arises from defendants' practice of exploiting home health care patients for revenue and income, notwithstanding the adverse effects on the patient. Plaintiff did not participate in these practices and acted to have them corrected and stopped. Defendants chose, instead, to disregard and ignore Plaintiff's protests. Moreover, one of defendants' managing agents

remarked that the wrongful practices were very lucrative. Defendants'

actions established these wrongful practices as a term and condition of

Plaintiff's employment; this caused and necessitated Plaintiff's constructive

discharge from employment.

2. Plaintiff pleads claims pursuant to the False Claims Act, specifically 31

U.S.C. § 3730(h), and pursuant to the common law of Kentucky for wrongful

discharge arising from the termination of her employment because her

refusal to violate a law in the course of her employment. Plaintiff seeks

recovery of lost pay and benefits, both past and future, compensatory and

punitive damages, costs, and attorney's fees.

## II

## Jurisdiction and Venue

3.  This Court has jurisdiction over this matter pursuant to both 28 U.S.C.

§§ 1331 and 1367, because one of plaintiff's claims raises an issue of federal

law, and because plaintiff's state law claim arises from a common nucleus of

operative fact. Venue is proper in the Eastern District of Kentucky pursuant

to 28 U.S.C. § 1391, because the claims arose in this judicial district.

## III

## Parties

4.  Sue Smith is a citizen of the United States and a resident of the state

of Kentucky.

2

5. Defendant LHC Group, Inc. is a Delaware corporation whose principal place of business, according to the records of the Kentucky Secretary of State, is 901 Hugh Wallis Road South, Lafayette, Louisiana. Its agent for service of process is Corporation Service Company, 421 W. Main St., Frankfort, KY 40601.

6. Defendant Kentucky LV, LLC, d/b/a, Deaconess – Lifeline Home Health is a limited liability company organized and registered in the state of Kentucky. According to the records of the Kentucky Secretary of State, it maintains its principal office in Lafayette, Louisiana, and its agent for service of process is Corporation Service Company, 421 W. Main St., Frankfort, KY 40601.

## IV

## Facts Giving Rise to the Lawsuit

7. Sue Smith, at all times pertinent hereto, was employed as a Registered Nurse and the Director of Nursing for Home Health for defendants at and for their Lexington, Kentucky office.

8. Smith's employment term with defendants' predecessor-in-interest began prior to 2010, continued when defendants acquired the predecessor and lasted up to October 26, 2016.

9. At all times pertinent hereto, Smith was (and remains) a Registered Nurse licensed by and subject to the regulation of the Kentucky Board of Nursing.

10. Smith's job duties for defendants consisted principally and materially of the following: supervising assessment and implementation of home care patients per physicians' orders and plan of care and administrative duties related to such care, including completion of forms necessary to secure funding under Medicaid and/or Medicare and/or private insurance.

11. At all times pertinent hereto, Smith performed her job duties for defendants consistent with their reasonable expectations.

12. Defendants are in the business of providing home healthcare services to patients in need of such services.

13. Defendants obtain home healthcare patients by way of referrals from physicians, hospitals, assisted care living centers, nursing homes and other healthcare providers.

14. A referral to defendants of a home healthcare patient typically comes with physician's orders specifying the home healthcare services needed for the patient, which can include, for instance, skilled nursing, occupational therapy, physical therapy, speech therapy, social workers and/or home health aide services.

15. Part of Smith's job duties for defendants included review and assessment of a referred patient's home health care orders to determine if defendants had available clinical staff and if available clinical staff possessed the skill and expertise necessary to provide the care needed for the referred and potential patient.

4

16. If Smith determined that defendants had the available clinical staff to provide the care needed for the referred patient consistent with applicable physician's order, she was authorized to accept the referral and take other steps and measures necessary to see that defendants' clinical staff began providing the necessary care and that defendants were paid by Medicare, Medicaid or other payment source for providing the care to the patient.

17. If Smith determined that defendants had the available clinical staff to provide the care needed for the patient and the patient was accepted, the next step in the patient intake process typically would be for either a skilled nurse or a physical therapist, depending on the initial referral order, to visit with, examine and assess the patient.

18. Sometimes defendants' initial in-home assessment and evaluation of the patient resulted in a determination that additional home healthcare services were needed for the patient beyond those indicated on the doctor's orders.

19. Sometimes defendants' initial in-home assessment and evaluation of the patient resulted in the determination that one or more of the home healthcare services indicated for the patient on the doctor's orders did not appear to be necessary, were not feasible to provide given the patient's living situation, had been rejected or declined by the patient or for some other good cause could not and/or should not be provided for the patient.

20. Where defendants' initial in-home assessment evaluation of the patient resulted in a determination either that additional home healthcare services were needed for the patient or the determination that one or more of the home healthcare services could not or should not be provided for the patient, the proper next step for defendants' clinical staff to follow would be to report this determination to the patient's doctor so that the doctor can decide whether the orders for the patient should be modified accordingly.

21. If Smith determined that defendants did not have sufficient number of clinical staff available to provide the care needed for the referred patient consistent with applicable physician's order, she was authorized merely to recommend the referral be declined but final decision-making authority as to whether the patient would be accepted by defendants was exercised by other agents of defendants.

22. Smith determined on many occasions that patient orders had been changed and/or altered with respect to the services and care needed for the patient, prior to the patient being seen or evaluated by any of defendants' clinical staff, so that the services and care needed for the patient would be consistent with defendants' available clinical staff.

23. Smith learned on numerous occasions from other staff employed in defendants' Lexington office that the initial patient referral orders were being changed, prior to the patient being seen or evaluated by any of defendants' clinical staff, to fit defendants' clinical staff availability at that given time.

6

24. Smith determined on many occasions that patient orders had been changed and/or altered, prior to the patient being seen or evaluated by any of defendants' clinical staff, with respect to the services and care needed for the patient so that such services and care were consistent with defendants' available clinical staff for the purpose of facilitating defendants' prompt and/or immediate acceptance of the patient and ability to generate revenue and income from that patient's care.

25. An example of an occasion in which Smith determined that patient orders had been changed and/or altered, prior to the patient being seen or evaluated by any of defendants' staff,  with respect to the services and care needed for the patient so that such services and care were consistent with defendants' available staff involved patient F.A., whose initial orders were for skilled nursing, occupational therapy and physical therapy but which were changed to only occupational and physical therapy without the patient first being seen or evaluated by any of defendants' clinical staff.

26. Smith determined on many occasions that patient orders had been changed and/or altered, prior to the patient being seen or evaluated by any of defendants' clinical staff, with respect to the services and care needed for the patient to enable defendants to accept the referral and begin generating revenue and income from that patient's care, notwithstanding the adverse effect on the patient.

7

27. Smith determined on many occasions that patient orders had been changed and/or altered with respect to the services and care needed by the patient, prior to the patient being seen or evaluated by any of defendants' clinical staff, for the purpose of having the patient accepted by defendants were done by or were done at the instigation of one of defendants' employees, who had a financial incentive to cause such changes, notwithstanding any adverse effect on any patient.

28. Instances where patient orders were altered or changed, prior to the patient being seen or evaluated by any of defendants' clinical staff, so that the patient could be accepted by defendants and defendants could begin generating revenue and income off the patient include but are not limited to the following: (1) the deletion of skilled nursing care where defendant lacked skilled nursing staff sufficient to cover the patient; (2) the deletion of skilled nursing from a patient's ordered disciplines without any order to discontinue nursing; (3) the deletion of skilled nursing without any note cancelling the service; (4) admitting a patient where the disciplines in the intake notes did not match the doctor's orders; and, (5) admitting a patient solely on the email of one of defendants' employees; and other examples.

29. Beyond the practice of changing and/or altering a patient's orders prior to the patient being assessed and evaluated by defendants' staff, defendants also followed a practice of admitting patients without adequately documenting either the patient's need for home healthcare services or the

type of home healthcare services that the patient needed. Instances of this practice include but are not limited to the following: (1) creation of an intake note identifying skilled nursing and physical therapy as the ordered disciplines where no nursing notes whatever were received; (2) assigned skilled nursing, physical therapy and occupational therapy as the disciplines where no note or order so indicated; (3) accepting a patient prior to receiving any doctor's order regarding the patient, which came three days later; (4) accepting a patient with a general order for "home healthcare services" but no indication that orders were clarified; (5) admitting a patient after disciplines were supposedly changed by a social worker without entry of a doctor's order.

30. Smith did not participate in the changing and/or altering of any patient orders, prior to the patient being seen or evaluated by any of defendants' clinical staff, and informed on many occasions defendants' senior management personnel of instances in which it had occurred.

31. Smith's reports to defendants' senior management personnel complied with her duty established under KRS 216B.165.

32. Had Smith participated in the changing and/or altering of any patient orders, prior to the patient being seen or evaluated by any of defendants' clinical staff, she would have violated KRS 314.091(1)(h), which prohibits falsification of an essential patient record.

33. Had Smith participated in the changing and/or altering of the patient orders prior to the patient being seen or evaluated by any of defendants'

9

clinical staff, so defendants could begin generating revenue and income off the patient's care, she would have violated provisions of Title 31, Chapter 37, Subchapter III of the United States Code.

34. Smith's efforts to prevent the changing and/or altering of patient orders prior to the patient being seen or evaluated by any of defendants' clinical staff, so that defendant could accept them as a patient and begin generating income and revenue off their care was an effort to stop or prevent a violation by defendants of provisions of Title 31, Chapter 37, Subchapter III of the United States Code.

35. Smith's refusal to participate in the changing and/or altering of the patient orders as described herein was a refusal to violate a law in the course of her employment.

36. Smith's refusal to participate in the changing and/or altering of the patient orders as described herein was a refusal to act in a manner inconsistent with the practice of nursing within the meaning of KRS 314.091(1)(d).

37. Smith's refusal to participate in the changing and/or altering of the patient orders as described herein was a refusal to falsify an essential record within the meaning of KRS 314.091(1)(h).

38. Smith's refusal to participate in the changing and/or altering of the patient orders as described herein and her efforts to have this practice stopped were lawful acts done in furtherance of an effort to stop or prevent a

10

violation by defendants of provisions of Title 31, Chapter 37, Subchapter III
of the United States Code.

39. Defendants' management personnel ignored and disregarded Smith's
efforts to have the practice of changing and/or altering of patient orders prior
to the patient being seen or evaluated by any of defendants' clinical staff, for
the purposes of securing their admission as a patient and to begin generating
revenue and income off the patient's care. One of defendants' management
personnel stated on one occasion that the employee principally responsible for
these practices was bringing in $6 million annually for defendants.

41. Defendants' refusal to terminate the practice of changing and/or
altering of patient orders prior to the patient being seen or evaluated by any
of defendants' clinical staff, for the purpose of securing their admission as a
patient and to begin generating revenue and income off the patient,
notwithstanding the detriment and harm to the patient, established these
practices as a term and condition of her employment.

41. No reasonable person would have continued in Smith's employment
position with defendants, given its refusal to terminate the practice of
changing and/or altering of patient orders prior to the patient being seen or
evaluated by any of defendants' clinical staff, for the purpose of securing their
admission as a patient and to begin generating revenue and income off the
patient's care, notwithstanding the detriment and harm to the patient, and
that this practice was established as a term and condition of her employment.

11

42. A substantial and motivating factor but for which Smith would not have been constructively discharged from employment were her lawful acts done in furtherance of her efforts to stop or prevent a violation by defendants of Title 31, Chapter 37, Subchapter III of the United States Code, her refusal to violate provisions of Title 31, Chapter 37, Subchapter III in the course of her employment and her refusal to violate KRS 314.091(1)(d) and (h) in the course of her employment.

43. As a direct and proximate result of the unlawful termination of her employment, Smith has suffered loss of wages, past and future, other injuries including embarrassment and humiliation, emotional distress, and mental anguish.

44. Defendants' actions in causing the termination of Smith's employment were done in reckless disregard and/or with gross negligence toward and regarding her rights.

**V**

**Causes of Action**

**Count I – Discharge In Violation of False Claims Act, 31 U.S.C. §3730(h)**

45. Smith incorporates Paragraphs 1-44 hereof as if incorporated fully herein.

46. Smith's refusal to alter the patients' orders was a refusal to falsify a record material to a false or fraudulent claim within the meaning of Title 31, Chapter 37, Subchapter III and most specifically 31 U.S.C. § 3729.

47. Smith's refusal to falsify the patients' orders and her efforts to correct or have stopped this practice were lawful actions done in furtherance of her efforts to stop or prevent a violation by defendant of the provisions of Title 31, Chapter 37, Subchapter III.

48. A substantial and motivating factor but for which Smith's employment would not have been terminated was her refusal to falsify the patients' orders and her efforts to stop or prevent a violation by defendant of the provisions of Title 31, Chapter 37, Subchapter III.

49. Smith's termination of employment was in violation of 31 U.S.C. § 3730(h).

**Count II – Wrongful Discharge; Refusal To Violate Title 31, Chapter 37, Subchapter III of the United States Code**

50. Smith incorporates Paragraphs 1-49 hereof as if fully incorporated herein.

51. A substantial and motivating factor for the termination of Smith's employment was her refusal to violate provisions of Title 31, Chapter 37, Subchapter III of the United States Code in the course of her employment. Therefore, Smith was wrongfully discharged under Kentucky law.

**Count III – Wrongful Discharge; Refusal To Violate KRS 314.091(1)(d) and/or (h)**

52. Smith incorporates Paragraphs 1-51 hereof as if fully incorporated herein.

13

53.  A substantial and motivating factor for the termination of Smith's employment was her refusal to violate KRS 314.091(1)(d) and/or KRS 314.091(1)(h) in the course of her employment. Therefore, Smith was wrongfully discharged under Kentucky law.

## VI

## Demand for Relief

WHEREFORE, Plaintiff Sue Smith demands judgment against defendant as follows:

(1)  Entry of a judgment awarding her lost pay and benefits, past and future, in such amount as proved by the evidence at trial and found by the jury;

(2)  Entry of a judgment awarding her double her lost pay and benefits in accordance with 31 U.S.C. § 3730(h);

(3)  Entry of a judgment awarding her compensatory damages for her injuries, past, present, and future, arising from the wrongful discharge of her employment;

(4) awarding her punitive damages against defendant based on its reckless disregard for and/or gross negligence toward her rights;

(5)  Awarding her costs, expenses, and attorney's fees incurred herein pursuant to 31 U.S.C. § 3730(h) and Fed.R.Civ.Pro. 54; and,

(6)  Granting her all other relief to which she is entitled.

14

**Demand For Trial By Jury**

Pursuant to Fed.R.Civ.Pro. 38, Plaintiff demands trial by jury on all

issues herein so triable.

Respectfully submitted,

BY: /s/ Robert L. Abell
120 North Upper Street
PO Box 983
Lexington, KY 40588-0983
859.254.7076
859.281.6541 Fax
Robert@RobertAbellLaw.com
COUNSEL FOR PLAINTIFF

15