UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| SUE SMITH,<br><br>  **Plaintiff,**<br><br>v.<br><br>LHC GROUP, INC., and KENTUCKY LV, LLC,<br><br>  **Defendants.** | CIVIL ACTION NO. 5:17-15-KKC<br><br><br><u>**OPINION AND ORDER**</u> |

\* \* \* \* \* \* \* \*

Defendants LHC Group, Inc. and Kentucky LV, LLC provide home healthcare services to referred-patients in exchange for payments from Medicare, Medicaid, and other private payors. How they go about obtaining those payments—at least according to former Director of Nursing Sue Smith—is less than scrupulous. Smith alleges that during her employ Defendants doctored patient orders and enrolled patients for services without proper documentation or regard for whether the patient even needed certain services—all in an effort to fill corporate coffers. Smith quit her job after Defendants persisted in the alleged fraud scheme despite her protestations. She brings this action alleging retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), and wrongful discharge under Kentucky law. Defendants move to dismiss Smith's complaint in its entirety. DE 4. For the reasons that follow, Defendants' motion will be granted.

A.

Defendants LHC Group, Inc. and Kentucky LV, LLC are home healthcare providers who obtain patients by way of referrals from physicians, hospitals, assisted-care living centers, nursing homes, and other providers. Compl. ¶ 13. Defendants provide services and

1

are paid through Medicare, Medicaid, and other private insurers. In normal course, referrals are submitted to Defendants with a physician's order specifying the type of healthcare services the patient needs. Compl. ¶ 14. Defendants then analyze the physician orders and determine if the provider "ha[s] available staff and if available clinical staff possesse[] the skill and expertise necessary to provide the care needed for the referred and potential patient." Compl. ¶ 15. Depending on the provider's availability, staff members of Defendants either authorize the referral or recommend to the "final decision-making authority" that the referral be declined. If Defendants authorize the referral, their healthcare providers then visit with and examine the patient. The examinations often resulted in the determination that the patient needed more care than the physician's order initially sought, but sometimes healthcare staff discovered that the physician orders "did not appear to be necessary, were not feasible to provide given the patient's living condition, had been rejected by the patient," or for some other reason could not be provided. Compl. ¶ 19. Such determinations were reported to the patient's doctor for further orders. If clinical staff determined that it not provide the care needed for the referral, the "final decision-making authority" decided whether to on-board the patient despite the clinical staff's recommendation to decline the referral. Compl. ¶ 21.

Smith worked for Defendants as a Registered Nurse and the Director of Nursing for Home Health, beginning in 2010 up until October 26, 2016. Compl. ¶¶ 7–8. Smith knew the ends and outs of Defendants' referral process. She supervised the assessment and implementation of patient care, which included making determinations as to clinical staff availability and recommending to her superiors whether or not Defendants could or should take on a referral. As part of her job, Smith also completed the forms necessary to secure funding under Medicare, Medicaid, and other private insurers.

At some point in her tenure as the Director of Nursing, Smith caught on to Defendants alleged fraud scheme, both through her own observations and other members' experiences of similar malfeasance. Compl. ¶ 23. The alleged scheme was simple and two-pronged. Defendants allegedly changed and altered patient orders so "the services and care needed for the patient would be consistent with [D]efendants' available clinical staff." Compl. ¶¶ 22, 26, 27, 28. Smith also determined that other employees for Defendants "admitt[ed] patients without adequately documenting either the patient's need for home healthcare services or the type of home healthcare services that the patient needed." Compl. ¶ 29. In essence, Smith discovered that Defendants allegedly cooked the books to allow Defendants to take on patients it otherwise could not accommodate to generate income.

Weary of potential illegality, Smith declined to participate in the scheme and decided to inform her superiors of what she discovered through "reports to [D]efendants' senior management personnel." Compl. ¶¶ 31, 39. Management ignored Smith and her whistleblowing efforts. On one occasion, certain personnel told her that the scheme brought in "$6 million annually." Compl. ¶ 39. Unwilling to work amongst such allegedly unethical business practices, Smith decided to quit her job. Compl. ¶ 41.

**B**.

Smith now brings this lawsuit seeking compensation and damages for her time working for Defendants. She alleges three claims: (1) that she was constructively discharged in violation of the anti-retaliation provision of the federal False Claims Act; (2) that she was wrongfully discharged under Kentucky law for her refusal to violate "Title 31, Chapter 37, Subchapter III of the United States Code"; and (3) that she was wrongfully discharged under Kentucky law for her refusal to violate KRS 314.091(1)(d) and/or (h).

Defendants' present motion is governed by Federal Rule of Civil Procedure 12(b)(6). That rule provides courts with a mechanism to enforce Rule of Civil Procedure 8, which

governs the sufficiency of a complaint. In determining whether a plaintiff's complaint can withstand a motion to dismiss, the Court will assume the veracity of well-pleaded factual allegations and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plausibility standard is met when the facts in the complaint allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint need not contain "detailed factual allegations," but must contain more than mere "labels and conclusions." *Id*. Put another way, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Because the facts in Smith complaint do not state a claim upon which relief can be granted on any of the three counts, Defendants' motion to dismiss, DE 4, will be granted in full.

**I.**

Smith argues that the termination of her employment violated the anti-retaliation provision of the FCA. *See* 31 U.S.C. § 3730(h). To establish a prima facie case under § 3730(h), Smith must prove that she engaged in a protected activity[1], that her employer knew she engaged in protected activity, and that her employer discharged or otherwise discriminated against her as a result of the protected activity. *Miller v. Abbott Laboratories*, 648 F. App'x. 555, 559 (6th Cir. 2016) (citing *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000)). This case focuses on the third consideration—whether Defendants "discharged or otherwise discriminated against" Smith.

Defendants did not fire Smith. She resigned her post, in her view, because "[n]o reasonable person would or could be expected to continue [his or her] employment" in the

---

[1] Defendants did not argue that was not engaged in protected activity for the purposes of the FCA, therefore, the Court will assume as much for the purposes of analysis.

4

circumstances she faced. DE 11, at 8. In seeking to hold Defendants liable, Smith proceeds under a constructive-discharge theory.

"A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 756 F.3d 714, 727 (6th Cir. 2014) (internal quotations and citations omitted); *Green v. Brennan*, __ U.S. __, 136 S.Ct. 1769, 1776 (2016) ("The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'")(quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004))).

To demonstrate a constructive discharge, Smith must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit. Laster, 756 F.3d at 727–28 (citing *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005)). The test "deliberately sets a high bar, as the law generally expects employees to remain on the job while pursing relief . . . ." *McKelvey v. Sec. of the Army*, 540 F. App'x 532, 535 (6th Cir. 2011) (internal citations and quotations omitted). The Sixth Circuit has set forth a list of factors to guide the inquiry when determining whether the first prong of the inquiry has been satisfied:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).

Smith has not presented any evidence to meet any of the seven factors to show that Defendants "deliberately created intolerable working conditions" so as to state a claim of constructive discharge. All of the allegations in her complaint critically fail to allege any fact that fits within any of the seven factors identified by the Sixth Circuit. Smith does not allege that she was demoted, she did not experience a reduction in salary, nor did Defendants allegedly reassign her work or do much else to encourage Smith to quit her job.

Instead of trying to fit her complaint within the *Logan* framework, Smith holds fast to one theory: that she justifiably resigned her due to the unethical nature of Defendants' business practices. Even accepting all of Smith's claims as true, as the Court must, and assuming *arguendo* that such a theory could constitute "intolerable working conditions" under *Logan*, her claim must fail. Smith's theory focuses solely on the allegedly insufferable working conditions she faced, but it ignores that a prima facie case of constructive discharge requires that an employer also act with an intention to force an employee to quit his or her job. *Laster*, 756 F.3d at 727–28. Smith's complaint tells the story of an employee who unwittingly became trapped working for a company who adopted a business model based on fraud, and despite efforts to follow protocol, had no real control over the decisions being made. Quite reasonably, Smith felt like she had to quit her job. But where her claims fails is that she has not alleged that Defendants perpetrated the alleged fraud—or that any of the concomitant effects of such a fraud—with the specific intention of forcing her to do so.

On this point, Smith contends that Defendants, by virtue of their allegedly fraudulent scheme, acted intentionally by sanctioning practices that violated the law. By supporting such behavior, Smith argues, Defendants essentially presented her with a choice, which she argues meets the intentionality requirement: to go along and get along or quit. The problem is that Smith does not allege facts that show Defendants did anything directly toward *her* to make *her* quit *her* job. In other words, she does not tether her employer's actions to the

necessary requirement that the employer's actions were done with the intent to have Smith quit her job. Smith alleges that she went to senior management with what she knew, but she does not allege, crucially, that Defendants—aside from not listening—ever took any action against her for her red-flag waving. Instead, Smith contends that the atmospheric conditions of her place of work were so toxic that anyone and everyone who knew and were bothered by Defendants' alleged actions could quit and sue for compensation because Defendants' scheme implicated everyone.

Smith's expansive theory of constructive discharge must fail as a matter of law. For one, it is doubtful that Defendants conducted this alleged scheme with an intention to make any employee feel the need to quit. *See Regan v. Faurecia Automotive Seating, Inc.*, 679 F.3d 475, 482 (6th Cir. 2012) ("Regan has not put forth evidence showing that Faurecia deliberately created intolerable working conditions, or *that there was any intention that the [new work schedule] was designed to force [Regan] to quit*.") (emphasis added). Moreover, she has cited no case in which a court has adopted such a theory and has not shown why this Court should be (or even could be) the first. To submit to such a theory would be to impermissibly lower what is a "high bar" without setting a limiting principle. *See McKelvey*, 540 F. App'x at 535. Simply put, Smith's first claim fails because she offers no allegations that Defendants deliberately created intolerable working conditions with the intention of forcing her—or anyone else—to quit. Therefore, the allegations contained in the complaint fail to state a claim for constructive discharge under the FCA.

## II.

Along with her FCA retaliation claim, Smith brings two separate causes of action for wrongful discharge under Kentucky law. Count II asserts a claim for wrongful discharge under Kentucky law based on "Title 31, Chapter 37, Subchapter III of the United States

Code." Compl. ¶ ¶ 50–51. Count III's wrongful discharge theory asserts a violation of KRS 314.091, a statute that regulates the licensing of registered nurses.

Employment in Kentucky is generally at-will. Indeed, in Kentucky "an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Bishop v. Manpower, Inc. of Cent. Kentucky*, 211 S.W.3d 71 (2006) (quoting *Firestone Textile Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). As with most rules, there is a limited exception that applies. Kentucky law recognizes an exception for terminations that are against public policy. But that exception is narrow: The employee's discharge must be "contrary to a fundamental and well-defined public policy as . . . evidenced by a constitutional or statutory provision." *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Only two situations are recognized by Kentucky courts "where grounds for discharging an employee are so contrary to public policy as to be actionable absent legislative statements prohibiting the discharge." *Id.* at 402. "First, where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment. Second, when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Id.* at 402. However, "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Id.* at 401.

Both Count II and Count III do not fall within these narrow exceptions. Therefore, both claims fail.

a.

Count II asserts a claim for wrongful discharge under Kentucky law based on "Title 31, Chapter 37, Subchapter III of the United States Code." Compl. ¶ ¶ 50–51. By this claim Smith seeks to use the FCA as the source of Kentucky public policy and relies on *Murphy v. Cockrell*, 505 F.3d 446 (6th Cir. 2007), to argue that "federal constitutional provisions and

8

statutes may support a wrongful discharge claim." (DE 11, at 15). There are several problems with this argument.

First, Smith misreads the holding in *Murphy*. The Sixth Circuit in *Murphy* found that the district court erred when it "ignore[d] the fact that Murphy ha[d] shown a protected United States constitutional right under the First Amendment" to establish that his discharge was contrary to fundamental and well-defined public policy. *Murphy*, 505 F.3d at 455. Smith argues that because the plaintiff in *Murphy* brought his First Amendment claim under 42 U.S.C. § 1983, which in her view "specified a remedy for the [constitutional] violation," the FCA should equally fit under Kentucky's public policy exception. DE 11, at 15. *Murphy* did deal with a constitutional claim brought under 42 U.S.C. § 1983. Contrary to Smith's argument, however, the *Murphy* court relied on the First Amendment of the United States Constitution to establish Kentucky public policy, 505 F.3d at 455, not § 1983. That is simply because § 1983 is not an independent source for substantive legal rights, rather a "vehicle to obtain damages for violations of both the Constitution and of federal statutes." *Cmtys. for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 681 (6th Cir. 2006). Thus, *Murphy*'s holding is of no consequence here.

Moreover, the second and simplest reason Smith's claim fails is that it is well-established that Kentucky public policy cannot be premised on a violation of federal law such as the FCA. *See Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005) (citation omitted) (holding that a violation of federal regulations cannot support a wrongful discharge claim under Kentucky law); *see also Fleming v. Flaherty & Collins, Inc.*, 529 F. App'x 654, 659 (6th Cir. 2013); *Peak v. Tru-Check, Inc.*, No. 13-11-GFVT, 2014 WL 235442, at \*3 (E.D. Ky. Jan. 22, 2014); *Goins v. Interstate Blood Bank, Inc.*, No. 4:03-40-M, 2005 WL 1653611, at \*4 (W.D. Ky. July 12, 2005). "Kentucky's wrongful discharge doctrine 'extends a right of

action only for the violation of a Kentucky statute or a constitutional provision.'" *Peak*, 2014 WL 235442, at *3 (citing *Shrout*, 161 S.W.2d at 355). Clearly, the FCA is not a Kentucky statute or a constitutional provision, so it cannot form the basis for Kentucky public policy. Such a prohibition makes sense. Allowing the FCA and other federal statutes and regulations to shape Kentucky public policy would effectively turn "federalism on its head." *Charles v. Print Fulfillment Services, LLC*, No. 3:11-553-TBR, 2015 WL 5786817, at *8 (E.D. Ky. Sept. 30, 2015) (citing *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002), *cited with approval in Goins*, No. 4:03-40-M, 2005 WL 1653611, at *4).[2] Accordingly, Count II fails to state a plausible claim for wrongful discharge in violation of Kentucky public policy because it fails as a matter of law.

### b.

In Count III, Smith contends that KRS 314.091, a statute regulating the licensure of registered nurses in Kentucky, is sufficient to fall under one of the two public policy exceptions to at-will employment. Although unclear, it appears that Smith casts this claim under the refusal to violate the law exception. As such, Smith argues that because she was faced with a choice of complying with KRS 314.091 or accepting the business practices of Defendants, she was wrongfully discharged. But because Smith does not allege that Defendants requested that she violate the law, Smith cannot maintain a wrongful termination claim under the refusal exception to Kentucky's at-will employment doctrine.

"To sustain a cause of action under the refusal exception, [a plaintiff] must show that [the defendant] made an affirmative request that [s]he violate the law." *Charles*, No. 3:11-

---

[2] Even if the FCA somehow could define Kentucky policy, the claim would still fail because the FCA preempts Smith's claim for wrongful discharge under Kentucky law. *See Goodwin v. Novartis Pharm. Corp.*, No 3:11-350-H, 2012 WL 1079086, at *5 (W.D. Ky. Mar. 30, 2012) ("Since the FCA is both the source of [plaintiff's] proposed public policy and provides its own civil remedy for violations of that policy, it preempts a wrongful discharge cause of action.") (citing *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 421 (Ky.2010)).

553-TBR, 2015 WL 5786817, at *6 (citing *Welsh v. Phx. Transp. Servs., LLC*, No. 2007-CA-001231-MR, 2009 Ky. App. LEXIS 137, at *12 (Aug. 14, 2009) (unpublished)). "[A]n employee's mere objection to the violation of law, without a refusal to act, does not constitute a wrongful termination claim." *Alexander v. Eagle Manufacturing, Inc.*, No. 15-127-DLB-JGW, 2016 WL 5420573, at *3 (E.D. Ky. Sept. 27, 2016) (collecting cases).

Helpful in explaining this standard is the Kentucky Supreme Court's decision in *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412 (Ky. 2010). There, plaintiffs asserted claims of wrongful termination after one person was fired after refusing to offer perjured testimony in a legal proceeding. In finding that the plaintiffs had stated a claim for wrongful discharge based on the laws against perjury, *Hill* offered this by way of explanation:

> [H]ad KLC never approached Kim Hill about her testimony in the Gilmore matter and the only conduct at issue was her eventual testimony on his behalf, a [Kentucky civil rights] claim could be stated upon termination but there would be no basis for a common law wrongful discharge claim, i.e. no request for perjured testimony.

*Hill*, 327 S.W.3d at 423. As shown in *Hill*, a requirement for the refusal-to-violate theory of wrongful termination is that before one refuses to violate, one's employer must request that the employee violate the law. *Alexander*, 2016 WL 5420573, at *3 ("Therefore, the essential element under the refusal-to-violate theory of wrongful termination is the employer's request that the employee violate law."); *Goins*, 2005 WL 1653611, at *5–*6.

Smith does not assert that Defendants' management or other employees instructed her to take action in her capacity as a nurse that could violate KRS 314.091. It is certainly possible that Smith felt she had no option but to comply with allegedly fraudulent business practices of Defendants and that the business practices alone forced her to do something that was possibly illegal, but in order to state a claim under the refusal-to-violate exception, an employer must specifically ask a plaintiff to violate the law. Smith alleges no facts that Defendants asked her to violate any law.

11

Smith resists this conclusion and relies on the Kentucky Court of Appeals' decision in *Follett v. Gateway Reg. Health System, Inc.*, 229 S.W.3d 925 (Ky. App. 2007), to argue that Kentucky law does not require an employer to request that an employee first violate the law. DE 11, at 17. *Follett* is less than clear analytically, but it does not appear to analyze the refusal-to-violate exception, but rather to meld that exception together with the protected-activity exception to at-will employment. In *Follett*, the court discussed whether the plaintiff had engaged in a statutorily protected activity when she reported billing irregularities to the State Board of Medical Licensure. *Follett*, 229 S.W.3d at 929. Although acknowledging that the plaintiff "based her claim on the exception to the employment-at-will doctrine whereby an employee cannot be discharged for refusing to violate a statute," *id.* at 928, the court proceeded to analyze whether the plaintiff "was engaged in the activities described in the Kentucky statutes." That inquiry is more relevant to the question of whether the plaintiff engaged in a protected activity, which is an entirely different exception to the general at-will policy established in *Grzyb*. *Id.*

The Court here need not completely reconcile *Follett* with *Grzyb*. After *Follett*, the Kentucky Court of Appeals directly addressed the question at hand in *Welsh*. *Welsh* held in no uncertain terms that:

> an employee claiming wrongful discharge due to a refusal to violate the law must show an affirmative request to him/her by the employer to violate the law. Stated otherwise, a claim of wrongful discharge in violation of a well-defined public policy will not stand when an employee has never been instructed to violate the law by her employer.

*Welsh*, No. 2007-CA-001231-MR, 2009 Ky. App. LEXIS 137, at *13 (applying *Northeast Health Management, Inc. v. Cotton*, 56 S.W.3d 440 (Ky. App. 2001)). Because Smith does not allege she was affirmatively asked by her employer to violate the law, her claim must fail under a refusal theory of wrongful discharge.

12

As a final matter, Smith's claim, even if brought under the protected activity exception fails as a matter of law. "Kentucky law clearly establishes that an employee's report of 'illegal activity to those other than public authorities is not protected activity under the public policy exception.'" *Alexander*, 2016 WL 5420573, at *5 (collecting cases). Even assuming that KRS 314.091 contains a well-defined public policy on which a wrongful termination claim could be based, Smith's claim fails because she does not allege any facts that show that she reported her misgivings about Defendants' business practices to any public entity. Smith alleges only that she reported her concerns to certain members of senior management. Smith's decision to report the allegedly illegal activity to Defendants' management dooms her claim because such an activity "is not protected activity under the public policy exception." *Zumot v. Data Mgmt Co.*, No. 2002-CA-002454-MR, 2004 WL 405888, at *1 (Ky. Ct. App. March 5, 2004). Accordingly, the allegations contained in Smith's complaint fail to state a claim for wrongful termination under the protected-activity theory.

C.

Smith's complaint paints an unsavory picture of Defendants and raises substantial concerns over what exactly went on during Smith's tenure as director of nursing. But this is not a proper case for recompense. The Court here is asked to answer a narrow question: whether Smith was wrongfully discharged or retaliated against. Smith's complaint invokes both a narrow exception to the FCA's anti-retaliation provision and to Kentucky's general rule favoring at-will employment.

Accordingly, for the reasons stated, IT IS ORDERED that:

1. Defendants LHC GROUP, INC. and Kentucky LV, LLC's motion to dismiss, DE 4, is GRANTED;

2. Plaintiff Sue Smith's complaint, DE 1, is DISMISSED with prejudice; and

3. This matter is STRICKEN from the Court's active docket.

A separate judgment shall issue.

Dated June 30, 2017.

*signature*

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY