UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| SUE SMITH,<br><br>    **Plaintiff,**<br><br>v.<br><br>LHC GROUP, INC., and KENTUCKY LV, LLC,<br><br>    **Defendants.** | CIVIL ACTION NO. 5:17-15-KKC<br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendants' motion for summary judgment. Plaintiff Sue Smith brought suit under the False Claims Act, 31 U.S.C. § 3730, alleging that she was constructively discharged in violation of that statute's anti-retaliation provision, and under state law, alleging that she was wrongfully constructively discharged for her refusal to violate federal and state law. (DE 1.) The Court granted Defendants LHC Group, Inc. and Kentucky LV, LLC's motion to dismiss the complaint. (DE 13; DE 14.) The United States Court of Appeals for the Sixth Circuit then reversed that judgment and remanded the case for further proceedings. (DE 17.) Defendants subsequently moved for summary judgment. (DE 49.) For the reasons stated below, the Court grants Defendants' motion.

## Background

### I. Factual Background

Defendants are home healthcare providers who obtain patients through referrals from physicians, hospitals, assisted care living centers, nursing homes, and other providers. (DE 1 at 4.) Defendants are paid for the services that they provide through Medicare, Medicaid,

1

and private insurers. (DE 1 at 4-5.) Referrals are usually submitted to Defendants with a physician's order specifying the type of home healthcare services that the patient needs. (DE 1 at 4.) These referrals are typically handled, at least initially, by a "patient care representative," or "PCR." (DE 49-1 at 3-4; DE 57 at 3.) Defendants' staff analyze the physician's order and determine if the provider "ha[s] available staff and if available clinical staff possess[] the skill and expertise necessary to provide the care needed for the referred and potential patient." (DE 1 at 4.) If Defendants initially authorize the referral, healthcare staff – typically either a nurse or physical therapist – visit with and examine the patient. (DE 1 at 5.) Following this initial, in-home assessment, the healthcare staff would sometimes determine that the patient needs more care than the original physician's order sought, and sometimes that one or more of the services indicated in the order "did not appear to be necessary, were not feasible to provide given the patient's living condition, had been rejected or declined by the patient," or for some other reason could not be provided. (DE 1 at 5.) Such determinations were reported to the patient's physician, "so that the doctor can decide whether the orders for the patient should be modified accordingly." (DE 1 at 6.) According to Plaintiff, if healthcare staff had determined that there was not sufficient staff available to provide the services recommended in the physician's order, some other "agents of defendants" maintained the "final decision-making authority as to whether the patient would be accepted by defendants." (DE 1 at 6.)

Defendants describe the process with some additional detail. According to Defendants, if none of the LHC-affiliated agencies in the local area had sufficient clinicians for all of the services originally ordered, the PCR handling the referral would contact the patient's physician, and the physician might revise the referral order by either removing or delaying one or more of the services. (DE 49-1 at 4-5.) According to Defendants, final plans of care for

patients would often differ from initial referral orders "and, in all cases, it is the physician who has the final say on the plan of care." (DE 49-1 at 5-6.)

Plaintiff worked for Defendants as a Registered Nurse and Director of Nursing, beginning with their predecessor-in-interest, from "prior to 2010" until October 26, 2016. (DE 1 at 3.) Plaintiff supervised the assessment and implementation of patient care, which included making determinations as to the availability of clinical staff and recommending to her superiors whether or not Defendants could or should take on a referral. (DE 1 at 4.) As part of her job, Plaintiff also completed the forms necessary to secure payment through Medicare, Medicaid, and private insurers. (DE 1 at 4.) At some point in her tenure, Plaintiff learned of what she supposedly believed to be a fraudulent scheme. (DE 1 at 6.) Defendants were allegedly altering patient orders prior to the evaluation by clinical staff so that "the services and care needed for the patient would be consistent with defendants' available clinical staff." (DE 1 at 6-7.) According to Plaintiff, a particular PCR, Cindy Sisler, originated most of these allegedly problematic changes to patient orders. (DE 57 at 5.) Defendants claim that "Smith and Sisler both have strong personalities and there was conflict between them about a range of issues." (DE 49-1 at 6.) Plaintiff also determined that some of Defendants' employees "admitt[ed] patients without adequately documenting either the patient's need for home healthcare services or the type of home healthcare services that the patient needed." (DE 1 at 8-9.) Apparently wary of potential illegality, Smith declined to participate in this conduct and purportedly "informed on many occasions defendants' [sic] senior management personnel of instances in which it had occurred." (DE 1 at 9.) Management allegedly ignored Smith and her whistleblowing efforts. (DE 1 at 11.) Unwilling to work amongst such allegedly unethical business practices, Smith decided to quit. (DE 1 at 11-12.)

## II. Procedural History

Plaintiff filed suit in this Court on January 9, 2017. (DE 1.) She seeks lost pay and benefits, compensatory and punitive damages, and other costs and fees, and alleges three claims: (1) that she was constructively discharged in violation of the anti-retaliation provision of the False Claims Act; (2) that she was wrongfully constructively discharged under Kentucky state law for her refusal to violate "Title 31, Chapter 37, Subchapter III of the United States Code;" and (3) that she was wrongfully constructively discharged under Kentucky state law for her refusal to violate KRS § 314.091(1)(d) and/or (h), statutes that regulate the licensure of registered nurses in Kentucky. (DE 1.) On June 30, 2017, the Court granted Defendants' motion to dismiss the complaint under FED. R. CIV. P. 12(b)(6). (DE 13.) The Court found that Plaintiff's complaint failed to allege facts showing that Defendants "deliberately created intolerable working conditions" so as to state a proper claim of constructive discharge. (DE 13 at 6.) This Court ruled that "a prima facie case of constructive discharge requires that an employer… act with an intention to force an employee to quit his or her job," and that Plaintiff had "not alleged that Defendants perpetrated the alleged fraud… with the specific intention of forcing her" to quit her job. (DE 13 at 6.) Regarding her state law claims, this Court noted that the exception to Kentucky's treatment of employment as at-will is limited to terminations contrary to a fundamental public policy, as evidenced by a constitutional or statutory provision. (DE 13 at 8.) As the Court explained, under Kentucky law, a discharge is actionable only where the reason for the discharge was, either, the employee's failure or refusal to violate a law in the course of employment, or, the employee's exercise of a right conferred by well-established legislative enactment. (DE 13 at 8.) As to her first state law claim, the Court disagreed with Plaintiff that "federal constitutional provisions and statutes may support a wrongful discharge claim" because "it is well-established that Kentucky public policy cannot be premised on a violation of federal law such as the FCA."

(DE 13 at 9.) Finally, as to her second state law claim, the Court found that Plaintiff did not properly allege that Defendants requested that she violate KRS § 314.091. (DE 13 at 10.)

On March 2, 2018, the Sixth Circuit reversed the Court's judgment and remanded the case for further proceedings. (DE 17.) The Sixth Circuit held that constructive discharge under § 3730(h), the False Claims Act's anti-retaliation provision, requires only "general intent" that an employee resign, and not a "conscious 'specific intention.'" *Smith v. LHC Group, Inc.*, 727 F. App'x 100, 102 (6th Cir. 2018). The Circuit "clarif[ied] that the standard described by *Held* [*v. Gulf Oil Co.*, 684 F.2d 427 (6th Cir. 1982)] is ultimately an objective one… the *Held* intent requirement can be satisfied so long as the employee's resignation was a reasonably foreseeable consequence of the employer's actions." *Id.* at 106. That court concluded that "a jury could find that LHC created intolerable conditions by ignoring Smith's complaints of illegal activity." *Id.* at 104. Regarding Plaintiff's state law claim of wrongful discharge premised on Defendants having requested that she violate KRS § 314.091, the Sixth Circuit found that, "[a]lthough district courts have consistently held that a Kentucky wrongful discharge claim requires proof of an affirmative request, no authoritative Kentucky case has created such an element." *Id.* at 107. The court reaffirmed its holding from *Alexander v. Eagle Mfg. Co., LLC,* 714 F. App'x 504 (6th Cir. 2017) that "Kentucky Supreme Court case law 'did not create an additional element – an explicit request from the employer that the employee violate the law.'" *Id.* (quoting *Alexander*). Plaintiff did not appeal the dismissal of her state law claim of wrongful discharge premised on her refusal to violate the False Claims Act. *Id.* at 107 n. 4.

The case then proceeded to discovery on the two remaining claims (DE 31; DE 33), and on July 29, 2019, Defendants filed a motion for summary judgment under FED. R. CIV. P. 56. (DE 49.) Regarding the federal law claim, Defendants argue, *inter alia*, that Plaintiff cannot establish a *prima facie* case of retaliation under the False Claims Act because Plaintiff

did not engage in any protected activity and because Plaintiff was not constructively discharged as a result of any protected activity. (DE 49-1 at 1-2, 10-20.) On the state law claim, Defendants argue, *inter alia*, that Plaintiff cannot establish a genuine issue of material fact that there was illegal activity at Defendants' agencies (DE 49-1 at 2, 23-24), that she either participated, or was asked to participate in illegal activity, or that her job required her complicity in any illegal activity (DE 49-1 at 2, 25).

<u>Analysis</u>

### I. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). All evidence, facts, and inferences must be viewed in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). In order to defeat a summary judgment motion, "[t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment must be entered if, "after adequate opportunity for discovery," a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 940 (6th Cir. 1995) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted).

### II. False Claims Act Claim

"For a defendant to be liable under the False Claims Act, it must knowingly present, or cause to be presented, 'a false or fraudulent claim for payment or approval.'" *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 528 (6th Cir. 2012) (quoting 31 U.S.C. § 3729(a)(1)(A)).[1] Under 31 U.S.C. § 3730(h), "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make" that person "whole" if that person "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by" that person in furtherance of some effort to stop a violation of the False Claims Act. This provision serves to "protect[] employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). "In order to establish a claim for retaliatory discharge, a plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.*[2] "Protected activity" as used in the standard means "efforts to stop" violations of the FCA and, accordingly, "to plead protected activity, [a plaintiff] must allege conduct directed at stopping what he reasonably believed to be fraud committed against the federal government." *Fakorede v. Mid-South Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017) (quoting § 3730(h)) (emphasis removed).[3]

---

[1] The statute also imposes liability for other, related conduct, such as "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

[2] Plaintiff identifies no direct evidence of retaliation – "evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (citation omitted). Because "[r]etaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims… Where a plaintiff proceeds with circumstantial [as opposed to direct] evidence of retaliation, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792] (1973) applies. Under the *McDonnell-Douglas* test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397-98 (6th Cir. 2015) (some citations omitted).

[3] "Protected activity" may also mean "activities that… were in furtherance of a *qui tam* action under § 3730 of the FCA," but that is not relevant here. *Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015).

Plaintiff alleges that Defendants have failed to uphold appropriate professional standards and that their conduct may have put patients at risk. But the False Claims Act is not intended to enforce professional standards or punish regulatory violations, it is intended to protect the government coffers from fraud. On summary judgment, Plaintiff must come forward with evidence of fraud. The law provides an avenue to argue that billing the government for services that violate contractual provisions or regulations amounts to fraud, but Plaintiff makes no clear attempt to address this approach. Because Plaintiff has no colorable argument that Defendants' conduct constitutes fraud against the government, she has failed to show that she engaged in any protected activity, or that she was constructively discharged as a result of any protected activity. Therefore, the Court grants Defendants' motion for summary judgment on Plaintiff's False Claims Act claim.

### A. *Protected activity*

Defendants argue that Plaintiff's claim for retaliatory constructive discharge fails because "the record is clear that Plaintiff did not engage in protected activity under the FCA." (DE 49-1 at 12.) Further, Defendants argue that "it is undisputed that the patient referral process is separate from the patient admission process, that Medicare does not regulate or otherwise apply to the referral process and LHC does not bill Medicare (or any other payor) for any activities relating to the referral process." (DE 49-1 at 13-14.) Defendants also argue that "even if there was somehow a connection between the patient referral process and Medicare, Plaintiff cannot establish any reasonable basis to conclude that any of Sisler's referrals were somehow improper (much less rose to the level of fraud on the government.)" (DE 49-1 at 14.) Plaintiff argues in response that "[t]he more patients referred, the more patients admitted, the more money a PCR makes" and, thus, "defendants' PCRs have a strong financial incentive to get a referred patient enrolled as a patient." (DE 57 at 3.) Plaintiff concedes that "[a]ccepting a referral is not the same as admitting or enrolling a patient," but

claims that "Defendants admit that they have followed and continue to follow a practice of working around their staffing shortages, which otherwise would cause a patient referral to be declined, by getting their patient's orders changed facilitate [sic] admission of the patient for defendants' financial gain." (DE 57 at 4.)

In an FCA retaliation case, "a plaintiff 'need not establish that [the employer] actually violated the FCA,' so long as she 'show[s] that her allegations of fraud grew out of a reasonable belief in such fraud.'" *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 460 (6th Cir. 2018) (quoting *Jones-McNamara*, 630 F. App'x at 400) (brackets in original). Accordingly, a plaintiff cannot show that he or she has engaged in protected activity unless "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Jones-McNamara*, 630 F. App'x at 399-400 (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)) (internal quotation marks omitted). The employer conduct primarily at issue here is "the alleged changing of referral orders to fit the disciplines that the agency had available" (DE 49-1 at 13); Plaintiff makes clear that "[t]he practice of getting the patient orders changed not for medical reasons but to work around staffing shortages is the crux of [her] objections and protests." (DE 57 at 5.)[4] She also testified during her deposition that the reason she "quit is… the orders were being changed… to fit the disciplines that we had available to admit the patients." (DE 57-5 at 45.)

As an initial matter, although the referral process may be separate from the admission process, referrals are obviously related to claims eventually made to the government: services

---

[4] Plaintiff's complaint vaguely alleges that a different series of conduct might form the basis of a separate fraud against the government: "defendants also followed a practice of admitting patients without adequately documenting either the patient's need for home healthcare services or the type of home healthcare services that the patient needed." (DE 1 at 8-9.) Because discussion of this conduct is not sufficiently developed for the Court to conclude that Plaintiff means to allege a second theory of fraud, and because of Plaintiff's instruction about the proper "crux" of her allegations, the Court will not consider it here further.

would not be rendered, and claims for payment for those services would not be made, unless Defendants initially accept a referral. Further, Plaintiff does not appear to allege that the referral process itself directly produced fraudulent claims – only that it led to changed patient orders, which directed apparently improper care, and then corresponding, allegedly fraudulent, claims for that care. One of the FCA's "primary uses has been to combat fraud in the health-care field," and "[t]he FCA reaches claims submitted by health-care providers to Medicare and Medicaid." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (citation omitted). Plaintiff's complaint alleges, and the record appears to confirm, that Medicare and Medicaid are billed for at least some services that Defendants provide. (DE 1 at 5; DE 57-2 at 6; DE 57-5 at 47.)

"Although the FCA does not define the terms 'false' and 'fraudulent,' as used in the statute, courts have interpreted the language to require a defendant to have aimed to extract from the government money the government otherwise would not have paid." *Chesbrough*, 655 F.3d at 467 (citation and internal quotation marks omitted). Plaintiff's cited evidence suggests only that Defendants did not provide patients certain services that were initially ordered by physicians. (DE 57 at 4, 7-8.)[5] Critical, then, to Plaintiff's argument is the assumption that Defendants not providing the *full* catalog of services initially ordered by a

---

[5] For example, Plaintiff elicited the following testimony during the deposition of Chris Stagg, a division president for LHC –
>Q: … are there any circumstances in which any… specified services would be eliminated before [a patient] would be further examined or assessed?
>A: Yes.
>Q: And what would those circumstances be?
>A: One circumstance would be if we… have a staffing issue or that we don't have that service available at that point.
>Q: Okay. Could you kind of elaborate and give me an example of how that would work?
>A: Yes. If… there was a verbal order given to send out an occupational therapist and we did not have availability to send out an occupational therapist, or even if it's in a timely manner, we would then notify the physician and the physician has the choice to either have us refer them to another home health agency or to give us permission to delay care on the patient until we have that discipline available.

(DE 57-2 at 14.)

physician renders a subsequent claim to the government for payment of *fewer* services fraudulent. In other words, Plaintiff's argument assumes that the government would not pay for *some* services that a physician originally recommended if the patient does not receive *all* the services that a physician originally recommended. Plaintiff provides no persuasive support for this position.

Plaintiff argues that Medicare fraud embraces conduct that is "inconsistent with professionally recognized standards of care" and "pos[es] a substantial likelihood of adversely affecting a patient." (DE 57 at 11.) The legal basis for this argument appears to rest entirely on 42 U.S.C. § 1320a-7(b)(6).[6] (DE 57 at 10.) Pursuant to that statute, individuals and entities may be excluded from participating in any federal health care program if, *inter alia*, they have "furnished or caused to be furnished items or services to patients… of a quality which fails to meet professionally recognized standards of health care." Plaintiff's only support for her particular interpretation and application of this statute appears to be a short booklet published by the Centers for Medicare & Medicaid Services, which reports in the cited portion that the U.S. Department of Health and Human Services' Office of the Inspector General "may impose permissive exclusions" from the federal health care programs on the "grounds [of]… [p]roviding unnecessary or substandard services." Medicare Fraud & Abuse: Prevent, Detect, Report, *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf (last visited November 19, 2019).

Even assuming – which the Court does not – that Defendants' alleged conduct constitutes substandard care, Plaintiff fails to provide any meaningful support in the law for the theory that claims to the government for care that is allegedly substandard necessarily constitute fraud for False Claims Act purposes, or that § 1320a-7(b)(6) can be applied in the

---

[6] This statute is incorrectly cited in Plaintiff's brief as 42 U.S.C. § 1320a-7(6). (DE 57 at 10.)

way that she suggests. When enacted, the False Claims Act was "aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein*, 423 U.S. 303, 309 (1976). The statute is designed to protect the government from being overcharged for goods and services and punish those who do so, not to generally regulate firms that submit claims to the government: "The FCA, it is true, is not intended as a general statute to enforce professional medical standards." *Crockett*, 721 F. App'x at 462; *see also Universal Health Serv., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) ("The False Claims Act is not… a vehicle for punishing garden-variety breaches of contract or regulatory violations.") Although an FCA retaliation claim requires a lesser showing of fraud than an FCA violation claim, "[t]his is not to say that any employee who complains of practices at an employer delivering services to the government can claim FCA retaliation if subsequently fired. Rather, an employee must show some linkage between the activities they complain of and fraud on the government." *Crockett*, 721 F. App'x at 460-61. The Court finds no genuine dispute as to a material fact regarding whether "a reasonable employee in the same or similar circumstances" would believe that Defendants were committing fraud against the government. *Jones-McNamara*, 630 F. App'x at 399-400.

There is an approach available to Plaintiff which might have established that Defendants billing the government for substandard services amounts to fraud, but it is essentially ignored by the parties. The false certification theory of liability assumes that "a false representation of compliance with a federal statute or regulation or a prescribed contractual term" in a claim to the government can, in some situations, render the claim fraudulent. *United States v. Teva Pharm. USA, Inc.*, 13 Civ. 3702 (CM), 2019 WL 1245656, at *6 (S.D.N.Y. Feb. 27, 2019) (citation and internal quotation marks omitted); *see also United States v. Villaspring Health Care Ctr., Inc.*, No. 3:11-CV-43-DCR, 2011 WL 6337455, at *6 (E.D. Ky. Dec. 19, 2011). Under this theory, "[l]iability… can be found when a defendant

12

violates its continuing duty to comply with the regulations on which payment is conditioned." *Villaspring*, 2011 WL 6337455, at *6 (quoting *United States ex rel. Augustine v. Century Health Serv.*, 289 F.3d 409, 415 (6th Cir. 2002)) (internal quotation marks omitted). The court in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) –

> identified two subcategories of false certifications, "express" and "implied." *Id.* at 697–702. "Express certification" applies if a contractor must expressly certify compliance with a particular legal requirement at the same time that it submits that claim to the Government for payment. *Id.* at 698…. "Implied certification," by contrast, is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." [*Id.*] at 699. In an implied certification case, the contractor does not need to certify its compliance with the underlying condition explicitly each time it submits a claim for payment. In order to cabin the liability that could result from such a theory, the *Mikes* court concluded that the implied certification theory of FCA liability "appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid." *Id.* at 700. This theory – called the "express-designation requirement" – operated like a default contract rule; the court relied on Congress to specify when compliance with certain statutes was a "condition to payment." *See Bishop* [*v. Wells Fargo & Co.*], 870 F.3d [104, 106 (2d Cir. 2017)].

*Teva*, 2019 WL 1245656, at *6. Several opinions within this circuit relied on *Mikes* for its discussion of false certification in False Claims Act litigation. *See, e.g.*, *Chesbrough*, 655 F.3d at 467-68; *Villaspring*, 2011 WL 6337455, at *6; *United States ex rel. Hobbs v. MedQuest Assoc., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013). In 2016, the Supreme Court issued its opinion in *Escobar*, 136 S. Ct. *Escobar* addressed a disagreement among courts over implied false certification and clarified the appropriate standard. The Court held –

> that False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment. Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment. Conversely, even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability. What matters is not the label

13

> the Government attaches to a requirement, but whether the *defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.*

*Escobar*, 136 S. Ct. at 1996 (emphasis added); *see also Teva*, 2019 WL 1245656, at *7 (discussing *Escobar*). *Escobar* provided guidance to False Claims Act plaintiffs on how to prove materiality, noting that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive," and that "proof of materiality can include… evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," among other considerations. *Escobar*, 136 S. Ct. at 2003-04; *see also Teva*, 2019 WL 1245656, at *7 (discussing *Escobar*).

Plaintiff does not discuss the false certification theory of liability, *Mikes*, *Escobar*, or whether compliance with § 1320a-7(b)(6) is ever material to the government's decision to pay for health care claims. Even if Plaintiff is correct that Defendants violated certain nursing standards, she has not successfully argued a theory as to why those violations amount to fraud against the government.

***B. Causal connection between protected activity and constructive discharge***

Defendants argue that Plaintiff's claim for retaliatory constructive discharge fails because she "cannot demonstrate a genuine issue of fact on [the] *prima facie* causation element" of her claim. (DE 49-1 at 19.) Plaintiff counters that "the Sixth Circuit has already rejected defendants' argument." (DE 57 at 10.)

"Constructive discharge occurs when working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith*, 727 F. App'x at 104 (citation and internal quotation marks omitted). As the Sixth Circuit ruled in the earlier appeal in this case –

> taking Smith's allegations as true, we find that a jury could find that LHC created intolerable conditions by ignoring Smith's complaints of illegal activity… A jury may conclude that it is damaging to a professional to require her to engage in activity she considers illegal and immoral with the threat of prosecution and loss of her nursing license looming in the background.

*Id.* However, even assuming – which the Court does not – that Defendants constructively discharged Plaintiff; and even assuming – which the Court does not – that Plaintiff can establish that she was engaged in protected activity undertaken to prevent or stop fraud; and even assuming – which the Court does not – that Plaintiff had a reasonable belief that Defendants' conduct constituted fraud; her claim still fails unless she can also establish that the constructive discharge was *retaliation* for protected activity undertaken to prevent or stop conduct that she reasonably believed to be fraud. The statute provides for "all relief necessary" only when the employee has been in some "manner discriminated against… *because of* lawful acts done by the employee… *to stop* 1 or more violations." 31 U.S.C. § 3730(h)(1) (emphasis added). As discussed above, Plaintiff must establish that the alleged constructive discharge was "a result of [her] protected activity." *Yuhasz*, 341 F.3d at 566.

The Sixth Circuit's opinion in this case did *not* "conclud[e] that Smith has shown such a causal connection," but "she must make such a showing to prevail." *Smith*, 727 F. App'x at

15

110 (Bush, J., concurring). The only efforts Plaintiff claims that she took to stop the allegedly fraudulent activity were "her complaints to LHC management." *Id.* (Bush, J., concurring). Therefore, "[s]he must allege and prove that LHC engaged in some action or inaction such as failing to eliminate the alleged fraud or screen her off from the allegedly fraudulent activity, which resulted in constructive discharge, 'because of' her complaints.'" *Id.* (Bush, J., concurring).

Despite the direction from the Circuit, Plaintiff makes little effort to address this issue, and, accordingly, she has failed to establish the required causal connection. Plaintiff's discussion of this issue is limited to brief, conclusory statements that are of little evidentiary value and only loosely on-point.[7] The Court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact. Instead, the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Patrick v. Croley*, No. 12-CV-61-GFVT, 2013 WL 5328342, at *2 (E.D. Ky. Sept. 20, 2013) (citations and internal quotation marks omitted). Rule 56 "provides that a party opposing summary judgment and arguing that a material fact is genuinely disputed must support that contention either by citing to materials in the record supporting a genuine factual dispute or by showing that the material in the record does not establish the absence of a genuine dispute." 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727.2 (4th ed.

---

[7] For example, the closest that Plaintiff's response to Defendant's motion comes to precisely addressing the required causal connection is probably the following phrase: "defendants ignored [Plaintiff's] protests and continued the [allegedly illegal] practices and this placed her in the position where… she chose instead to resign." (DE 57 at 14.) But this statement is not supported with citation to the evidentiary record. Plaintiff also argues in her response that "she was compelled to resign her employment when she saw the wrongful practices would continue, her protests notwithstanding." (DE 57 at 5.) In support of that statement, she cites to a portion of her interrogatory answers, in which she says, "[e]ventually, I was forced out because I would not turn a blind eye and go along with the fraudulent activities." (DE 57-6 at 6.) She also claims that, "[s]ince she also expressed interest and necessity in remaining employed if she could insulate herself from defendants' fraudulent and wrongful conduct, a jury can find easily that these practices were the but for causation of her employment ending." (DE 57 at 12.) This statement does not further the required argument that Defendants' failure to end the allegedly fraudulent activity, or screen her from that activity, was the result of Plaintiff's efforts to end that activity.

2019). The Court finds no genuine dispute as to a material fact regarding whether Plaintiff's purported protected activity was causally connected to her purported constructive discharge.

**III. State Law Claim**

Under Kentucky state law, there are only two situations in which the "grounds for discharging an employee are so contrary to public policy as to be actionable absent explicit legislative statements prohibiting the discharge[:] where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment [and] when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985) (citations to *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710 (Mi. 1982) and internal quotation marks omitted). Only the first variety of wrongful discharge is relevant here. *Smith*, 727 F. App'x at 106-07.

Because Plaintiff identifies no evidence that Defendants' conduct at issue was illegal, the Court grants Defendants' motion for summary judgment on Plaintiff's state law claim.

Plaintiff alleges that "[a] substantial and motivating factor for the termination of Smith's employment was her refusal to violate KRS 314.091(1)(d) and/or KRS 314.091(1)(h)," Kentucky statutes that regulate the practice of nursing.[8] (DE 1 at 14.) But even if Plaintiff "may have believed that Defendants' actions were violations of Kentucky law… [her] subjective belief does not determine whether an action is one that is violative of public policy. Plaintiff must put forth evidence that the Defendants actions were in fact violations of Kentucky law." *Chavez v. Dakotta Integrated Sys., LLC*, 832 F. Supp. 2d 786, 803 (W.D. Ky. 2011); *see also Mastin v. Windstream Yellow Pages*, No. 06-CV-380-JBC, 2008 WL 5082919,

---

[8] Under these two provisions, the Kentucky Board of Nursing may "reprimand, deny, limit, revoke, probate, or suspend any license or credential to practice nursing… or to otherwise discipline a licensee, credential holder, privilege holder, or applicant, or to deny admission to the licensure examination, or to require evidence of evaluation and therapy upon proof that the person… [h]as negligently or willfully acted in a manner inconsistent with the practice of nursing… [or] [h]as falsified or in a negligent manner made incorrect entries or failed to make essential entries on essential records." KRS § 314.091.

17

at *2-*3 (E.D. Ky. 2008). Even raising a "legitimate question" as to the legality of employer conduct is not necessarily enough for the basis of a wrongful discharge claim. *See Farrell v. American Ret. Corp.*, No. 2005-CA-001126-MR, 2006 WL 2519562 (Ky. Ct. App. Sept. 1, 2006). In order to satisfy her burden, Plaintiff must "identif[y] facts in the record that show" a violation of the law. *Chavez*, 832 F. Supp. 2d at 803.

Plaintiff's briefing on this issue is without sufficient citation to the record or treatment of the law. It is Plaintiff's duty to identify the "specific portions of the record upon which [she] seeks to rely to create a genuine issue of material fact." *Patrick*, 2013 WL 5328342, at *2 (citation and internal quotation marks omitted). The Court agrees with Defendants that, without any evidence of "activity that violates Kentucky law, Plaintiff's wrongful discharge claim fails as a matter of law." (DE 49-1 at 24.) The Court finds no genuine dispute as to a material fact regarding whether Plaintiff failed to, or refused to, violate KRS § 314.091 in the course of her employment.

## **Conclusion**

Accordingly, the Court hereby ORDERS that:

1) Defendants' motion for summary judgment (DE 49) is GRANTED;

2) a judgment will be entered contemporaneously with this order.

Dated December 9, 2019

*Karen K. Caldwell*
KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY